IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ELIZABETH A. KESSLER, | : | |
| | : | |
| Plaintiff, | : | |
| v. | : | 3:13-CV-00207 |
| | : | (JUDGE MARIANI) |
| AT&T, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM OPINION

### I. INTRODUCTION AND PROCEDURAL HISTORY

On January 28, 2013, Plaintiff, Elizabeth A. Kessler, filed this suit against Defendant,

AT&T Mobility Services, LLC ("AT&T"). (Compl., Doc. 1). After the Court dismissed

Plaintiff's claim for intentional infliction of emotional distress (see Order, Doc. 20), she filed

an Amended Complaint (Doc. 26) on December 12, 2013. In the Amended Complaint,

Plaintiff, a former employee of Defendant, alleges violations of the Americans with

Disabilities Act ("ADA"), 42 U.S.C. § 12101, et seq., Title VII of the Civil Rights Act, 42

U.S.C. § 2000e, et seq., and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Stat.

§ 951, et seq. (Doc. 26 at ¶1). Prior to initiating lawsuit, Plaintiff timely filed a Charge of

Employment Discrimination with the Equal Employment Opportunity Commission ("EEOC")

and the Pennsylvania Human Relations Commission ("PHRC") against AT&T. (Id. at ¶3).

The EEOC issued a Notice of Right to Sue, and Plaintiff initiated the present action within

90 days. (Id. at ¶3.)

Currently pending before the Court is Defendant's Motion for Summary Judgment (Doc. 51). The parties have fully briefed the motion and it is now ripe for disposition. For the reasons set forth below, the Court will deny Defendant's motion.

## II. STATEMENT OF MATERIAL FACTS

In accordance with Local Rule 56.1, Defendant has submitted a Statement of Undisputed Facts (Doc. 52) ("SMF") as to which it submits there is no genuine dispute for trial. Plaintiff subsequently submitted a Counter-Statement of Undisputed Facts in Opposition to Defendant's Motion for Summary Judgment (Doc. 55). Except where expressly noted, the following facts of record are undisputed.

Between September 2002 and her resignation on October 9, 2012, Plaintiff was a Retail Sales Consultant ("RSC") at the AT&T store in the Schuylkill Mall. (SMF, Doc. 52 at ¶1; Answer to SMF, Doc. 55 at ¶1). In 2008, Plaintiff transitioned to part-time status. (*Id.* at ¶2 n.2). As defined by the RSC Job Description, RSCs "must be able to stand for long periods of time while servicing customers" and are also subject to sales quota requirements. (*Id.* at ¶2). Plaintiff's immediate supervisor was the Store Manager of AT&T's Schuylkill Mall location, Victoria Kechula (previously, Victoria Koszyk). (*Id.* at ¶3). The Area Retail Sales Manager, Christopher McCambridge, was Kechula's immediate supervisor.[1] (*Id.*). In 2007, Plaintiff received a "Counseling Notice" related to a "heated discussion" with a co-worker, a "Written Warning" related to two instances of inadequate customer service, and a "Final

---

[1] Plaintiff responds by admitting SMF ¶3 in part. Plaintiffs assert that Kechula also reported to Michelle Grounds, an "Accommodations Specialist" with AT&T. (Answer to SMF, Doc. 55 at ¶3).

Written Warning" for failing to meet certain sales quotas. (*Id.* at ¶¶4-6). Plaintiff did not feel

that these disciplines were discriminatory or retaliatory.[2] (Doc. 52 at ¶7; Doc. 55 at ¶7). In

May 2011, Plaintiff was issued a document formalizing a "Counseling" related to a

"confrontation on the sales floor in front of the customers [between Plaintiff and a co-worker]

in regards to handling of the customer transaction and sales process, in which a loud and

unprofessional disagreement occurred."[3] (Doc. 52 at ¶8; *see also* Doc. 52, Ex. 7 at 1).

Plaintiff was diagnosed with Parkinson's disease in 2008, but did not request any

related accommodations until 2011. (Doc. 52 at ¶9; Doc. 55 at ¶9). Plaintiff recalls that she

approached Kechula in April or May 2011 to discuss accommodations related to her

Parkinson's. (*Id.* at ¶10). Kechula told Plaintiff to contact AT&T's Integrated Disability

Service Center ("IDSC") with regard to her request for accommodations. (*Id.* at ¶11).

According to the IDSC Guide, an IDSC job accommodation specialist would be assigned to

Plaintiff. (*Id.* at ¶12). The role of the accommodation specialist was to collect medical

---

[2] Plaintiff responds by admitting SMF ¶¶4-7 in part. Plaintiff points the Court to deposition testimony to provide context for the issuance of these disciplines. (Doc. 55 at ¶¶4-7.) She goes on to deny their relevance to the case at hand, but does not deny the content of SMF ¶¶4-7 itself. (*Id.*).

[3] Though Plaintiff responds by denying SMF ¶8, the Court has reviewed her response and finds that it does not constitute a genuine denial. Plaintiff claims that "[t]here is no "counseling dated May 18, 2011 within exhibit "G" of AT&T's submission." (Doc. 55 at ¶8). Defendant's Exhibit G (Doc. 52, Ex. 7) contains a two-page document addressed to Plaintiff from Kechula and labelled "Re: Counseling." The document contains three dates: 1) "Activation Date: 05/18/2011"; 2) "Completion Date: 08/18/2011"; and 3) a reference to a confrontation occurring on May 16, 2011. Plaintiff may disagree as to the nomenclature used by Defendant or the proper date reference for a document apparently opened on one date, closed on another, and referring to an incident on a third date, but Plaintiff cannot reasonably deny that the document referred to by Defendant in SMF ¶8 was indeed included in the exhibit cited to by Defendant. In her response, Plaintiff also adds that "to the extent there was a 'discipline' in May 2011," it occurred only after Plaintiff had notified her supervisor of her disabilities and requested accommodations. (Doc. 55 at ¶8). This does not constitute a denial of the contents of Defendant's Exhibit G (Doc. 52, Ex. 7). The Court deems Plaintiff to have admitted SMF ¶8.

information from the individual requesting accommodations, verify that information with the person's treatment provider, and then notify the individual and that individual's department at AT&T as to whether accommodations were medically necessary and as to the recommended duration for said accommodations. (*Id.*). According to the Guide, the individual's department would then "consider the request . . . and notify . . . the job accommodation specialist if the . . . accommodation [could] be provided." (*Id.*). Plaintiff and her treatment provider worked with the IDSC job accommodation specialist and the requested accommodations were communicated to Defendant.[4] (Doc. 52 at ¶13; Doc. 55 at ¶13).

The IDSC wrote a letter to Plaintiff dated July 21, 2011 listing the permanent restrictions that would be communicated with her supervisor. (*Id.* at ¶14). Those restrictions were: 1) "[f]ive minutes of time between customers for documentation;" 2) "[w]ireless mouse for left or right hand use or touch screen in place of mouse;" 3) "[c]hair/stool at computer to take 5 minute breaks after 15 minutes of continuous standing/walking;" 4) "[w]ork hours consisting of 27-35 hours each week;"[5] 5) "[a]bility to wear sneakers to work;" 6) "[s]ignature stamp;" 7) "[d]esignated quiet work area;" and 8) "[s]urvey and secret shopper consideration referencing voice energy." (*Id.*). The letter

---

[4] Plaintiff responds to SMF ¶13 by denying it in part. (Doc. 55 at ¶13). The Court has reviewed Plaintiff's response and reads it to create a dispute over which of AT&T's employees or agents the IDSC contacted directly. Defendant contends that "Plaintiff's requested accommodations were communicated to Plaintiff's department (i.e. Kechula and McCambridge)." (Doc. 52 at ¶13). Plaintiff asserts that the IDSC communicated with Michelle Grounds, AT&T's "Accommodations Manager." (Doc. 55 at ¶13).

[5] The Court notes that Plaintiff had been working part-time hours since 2008. (Doc. 52 at ¶2 n.2; Doc. 55 at ¶2).

stated that it should not be read to imply that Plaintiff's department would be able to reasonably provide the listed accommodations and instructed Plaintiff to follow up with her direct supervisor about the department's ability to reasonably accommodate her. (*Id.* at ¶15). As of the date of the IDSC letter, the only accommodation Plaintiff says she had received was the ability to wear sneakers. (*Id.* at ¶16). According to Plaintiff, the lack of accommodations (beyond sneakers) up to that point did not prevent her from performing her job duties: "I was always able to do my job, it's just I would be able to do my job better with my accommodations." (*Id.*).

On August 5, 2011, Plaintiff, Kechula, and McCambridge met in regard to her requested accommodations.[6] (Doc. 52 at ¶17; Doc. 55 at ¶17). As of the date of this meeting, Plaintiff admits that she was performing all of the job duties of an RSC. (*Id.* at ¶18).

In her deposition, Plaintiff referred to any modifications she received to her work at Defendant's store as "partial accommodations." (*Id.* at ¶22). Plaintiff's chief concerns are "not being allowed to sit at her work station" and "not being provided a sufficient amount of time between transactions to document the previous sale." (*Id.*).

Plaintiff waited on five to ten customers in a typical, eight-hour work day. (*Id.* at ¶29). On average, the store was empty of customers two to three times a day. (*Id.*). There was a

---

[6] Plaintiff responds that SMF ¶17 is "[d]enied, in part." (Doc. 55 at ¶17). The Court has reviewed Plaintiff's lengthy response and deems the statement that a meeting took place admitted. Plaintiff denies any suggestion in Defendant's wording that there was an interactive exchange at the meeting or that its outcome was not predetermined. (*Id.*).

prohibition on sitting at the work station when Kessler was interacting with customers.[7] (Doc. 52 at ¶25; Doc. 55 at ¶25).

A "Counseling" dated December 22, 2011 was issued to Plaintiff for failure to meet relevant sales quotas in November 2011; Plaintiff does not dispute the sales numbers that served as a basis for the discipline. (*Id.* at ¶¶30-31). Plaintiff again failed to meet her sales quotas in December 2011; rather than progressing Plaintiff to the "Written Warning" level of AT&T's disciplinary process, Defendant invoked a "pause" in the process and kept Plaintiff at the "Counseling" level.[8] (*Id.* at ¶34). Plaintiff received a Written Warning dated March 20, 2012 for "customer abandonment."[9] (*Id.* at ¶35). Plaintiff received a "Final Written Warning" in May 2012 for failing to meet the relevant sales quotas in the prior month. (*Id.* at ¶38). Plaintiff does not dispute the sales numbers that served as a basis for the Final Written Warning.[10] (*Id.* at ¶39).

Plaintiff "alleges that Kechula spoke to her in a 'condescending, sarcastic, and demeaning manner.'" (Doc. 52 at ¶41; Doc. 55 at ¶41). Plaintiff further alleges that a co-worker said to her, "I'm sick and tired of you getting these accommodations, and I'm going to make sure that I tell people and get you in trouble." (*Id.* at ¶42).

---

[7] Plaintiff denies SMF ¶25 in part. (Doc. 55 at ¶25). The Court has reviewed Plaintiff's response and has noted here only the portions of SMF ¶25 as to which there is no genuine dispute.

[8] While Plaintiff "admit[s] in part" SMF ¶34, the Court has reviewed her response and finds that there is no genuine dispute as to whether or not a "pause" was actually invoked. (Doc. 55 at ¶34).

[9] Plaintiff admits that the Written Warning for customer abandonment was issued, but disputes the underlying facts that led to the issuance of this document. (Doc. 55 at ¶¶35-37).

[10] Plaintiff denies SMF ¶39. (Doc. 55 at ¶39). The Court has reviewed Plaintiff's response, which denies only Defendant's proffered reason for her failure to meet the quotas. (*Id.*) There is no genuine dispute that Plaintiff did not meet here sales quotas for April 2012.

6

Jason Clews, Assistant Store Manager, informed Kechula "in or around early October 2012" that a customer had complained about Plaintiff.[11] (*Id.* at ¶43). Kechula and Clews had a meeting with Plaintiff on or about October 7, 2012 to "discuss [her] accommodations."[12] (*Id.* at ¶44). Plaintiff resigned two days after the meeting on October 9, 2012. (*Id.* at ¶45). Plaintiff was not fired, nor was she asked to resign. (*Id.*). At her deposition, Plaintiff explained the reason behind her resignation as follows: "[j]ust the overall constant negativity, the torment, the non-supportiveness of Vickie [Kechula]. Nowhere to turn within the company."[13] (Doc. 52 at ¶45; Doc. 55 at ¶45). Plaintiff is aware that Defendant maintains a toll-free hotline through which employees can report workplace discrimination, harassment, or retaliation; Plaintiff never called the number to report anything relating to her experiences at AT&T.[14] (*Id.* at ¶46).

---

[11] Though Plaintiff denies SMF ¶43, the Court has reviewed Plaintiff's response and finds that it does not constitute a proper denial. (Doc. 55 at ¶43). In her response, Plaintiff states that "[o]nly Jason Clews heard the costumer complain" and that "no customer complained about Kessler in Kessler's presence." (Doc. 55 at ¶43). These assertions are not in tension with Defendant's SMF ¶43.

[12] Though Plaintiff denies SMF ¶44, the Court has reviewed Plaintiff's response and finds that it does not constitute a proper denial. (Doc. 55 at ¶44). In her response, Plaintiff gives no explanation for her denial other than a quotation from deposition testimony that is, on its face, wholly irrelevant to the veracity of Defendant's SMF ¶44. Plaintiff does not explain why her own deposition testimony (cited to by Defendant) as to her meeting with Kechula and Clews on October 7, 2012 and the content of that meeting should not be credited. The Court deems admitted the fact that Kechula and Clews met with Plaintiff on or about October 7, 2012 to discuss her accommodations.

[13] Plaintiff admits SMF ¶45 in part. (Doc. 55 at ¶45). The Court has reviewed Plaintiff's response in its entirety and finds that it does not constitute a genuine denial of Defendant's SMF ¶45. Thus, the Court deems SMF ¶45 admitted in full.

[14] Plaintiff admits SMF ¶46 in part. (Doc. 55 at ¶46). The Court has reviewed Plaintiff's response in its entirety and finds that it does not constitute a genuine denial of Defendant's SMF ¶46. Thus, the Court deems SMF ¶46 admitted in full.

### III. STANDARD OF REVIEW

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "As to materiality, . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888 (1990). Therefore, the non-moving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory statements that a factual issue exists. *Anderson,* 477 U.S. at 248. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). In evaluating whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). "Inferences should be drawn in the light most favorable to the non-moving party, and where

8

the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied* 507 U.S. 912 (1993). However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## IV. ANALYSIS

### A. PLAINTIFF'S "DISABILITY-BASED DISCRIMINATION AND RETALIATION" CLAIMS (COUNT I)[15]

#### 1. DISCRIMINATION

At the summary judgment stage of litigation, Plaintiff's discrimination claim is analyzed according to the familiar burden shifting approach laid out in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). *See Stanziale v. Jargowsky,* 200 F.3d 101, 105 (3d Cir. 2000) ("The parties' burdens in establishing and defending claims [for discrimination] are determined by the procedure set forth in *McDonnell Douglas Corp. v. Green*."). "[T]he plaintiff must first establish a prima facie case. The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the discharge. If the defendant does so, the presumption of intentional discrimination disappears, but the plaintiff

---

[15] Plaintiff styles Count I of her Amended Complaint as "Disability-Based Discrimination and Retaliation under Title I of the ADA, as Amended by the ADA Amendments of 2008, and Title VII of the Civil Rights Act of 1964, as Amended by the Civil Rights Act of 1991." (Doc. 26 at 11). Upon further review of the allegations contained in Count I, the Court has determined that Plaintiff's lawsuit is based solely on circumstances related to her Parkinson's Disease (as the heading of Count I itself suggests). Disability is not a protected class under Title VII, 42 U.S.C. § 2000e, *et seq.*, which prohibits discrimination on the basis of race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2. Indeed, in her Brief in Opposition (Doc. 54), Kessler does not mention Title VII and cites only provisions of the ADA. (*See* Doc. 54 at 5). Accordingly, the Court finds Kessler has not stated a claim under Title VII of the Civil Rights Act and that her discrimination, retaliation, and harassment claims contained in Count I all arise under the ADA.

can still prevail by showing that the employer's proffered reason is merely a pretext for discrimination." *James v. Sutliff Saturn, Inc.*, 468 F. App'x 118, 120 (3d Cir. 2012). The Court will treat each step of the *McDonnell Douglas* analysis in turn.

### a. McDonnell Douglas Step One: Plaintiff's Prima Facie Case

Under the ADA, an employer may not "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To establish a prima facie case of disability discrimination under the ADA, a plaintiff must show that "(1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination." *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999). "A disabled employee may establish a prima facie case under the ADA if she shows that she can perform the essential function of the job with reasonable accommodation and that the employer refused to make such an accommodation." *Turner v. Hershey Chocolate U.S.*, 440 F.3d 604, 610 (3d Cir. 2006) (citing *Skerski v. Time Warner Cable Co.*, 257 F.3d 273, 284 (3d Cir. 2001).

Thus, the Court begins its analysis with whether Plaintiff has presented sufficient evidence that she is a disabled person within the meaning of the ADA to proceed to trial. The ADA defines "disability" as: (A) "a physical or mental impairment that substantially limits

10

one or more of the major life activities of such [an] individual"; (B) "a record of such an impairment"; or (C) "being regarded as having such an impairment." 42 U.S.C. § 12102(1). The Court reads Plaintiff's submissions at the summary judgment stage to indicate that she is pursuing her case under definition (A): the "actual disability" prong.[16]

Neither party addresses head on whether Plaintiff is disabled within the meaning of the ADA. Indeed, Plaintiff seems to assume that the mere existence of a Parkinson's diagnosis is sufficient to meet the definition of disability. (See Plaintiff's Brief in Opposition, Doc. 54 at 18) ("Parkinson's interferes with major life activities of speech, coordination, standing, and mobility."). However, "determination of whether an impairment substantially limits a major life activity requires an individualized assessment." 29 C.F.R. § 1630.2; see also Lit v. Infinity Broad. Corp. of Pa., 423 F. Supp. 2d 485, 492 (E.D. Pa. 2005) (wherein plaintiff acknowledged that his mild form of Parkinson's disease "did not substantially limit his ability to perform his job" as a radio host). Nonetheless, the implementing regulations of the ADA Amendments Act of 2008 make clear that:

> The primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether the individual meets the definition of disability. The question of whether an individual meets the definition of disability under this part should not demand extensive analysis.

---

[16] Though Plaintiff broadly pleads her claims as "based on her actual and/or perceived disability and/or record of impairment," (Doc 26. at ¶34), the Court assumes for the purposes of this motion that she is proceeding under the "actual disability" prong. Because Plaintiff's case survives summary judgment under this definition of disability, it is not necessary at this time to evaluate her case using the other definitions of disability contained in the ADA.

29 C.F.R. § 1630.1; *see also* 29 C.F.R. § 1630.2 ("Accordingly, the threshold issue of whether an impairment 'substantially limits' a major life activity should not demand extensive analysis."). Against this background of congressional intent in the ADA Amendments Act and its implementing regulations, the Court finds that, drawing all reasonable inferences in the light most favorable to the Plaintiff, a jury could conclude that Plaintiff is disabled within the meaning of the ADA. Evidence in the record supporting the Court's finding includes Plaintiff's descriptions of her symptoms while employed by Defendant (*see, e.g.*, Kessler Deposition, Doc. 52, Ex. 1 at 16-17), the IDSC's communication to AT&T that certain accommodations provided (*see* IDSC Letter, Doc. 52, Ex. 9), and various references to and pieces of Plaintiff's medical records and history (*see e.g.*, Doc. 52, Ex. 1 at 16; Barbour Records, Doc. 55, Ex. 7 at 18-25).

The Court now moves to the second element of an ADA discrimination claim: whether the Plaintiff is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations. The EEOC regulations on the subject divide the determination of whether an individual with a disability is "qualified" in to a two-part analysis: whether 1) "the individual satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires" and 2) "with or without reasonable accommodation, can perform the essential functions of such position." 29 C.F.R. § 1630.2(m); *see also Turner*, 440 F.3d at 611. "The determination of whether an individual with a disability is qualified is to be made at the time of the

employment decision." 29 C.F.R. § Pt. 1630, App; *see also Gaul v. Lucent Technologies, Inc.*, 134 F.3d 576, 580 (3d Cir. 1998). Defendants do not appear to dispute that Plaintiff had the "requisite skill, experience, and education" to hold the RSC position at the time of the alleged adverse employment actions. Indeed, Plaintiff had successfully held that very position for years prior. *See, supra* Part II.

Instead, the determination of whether Plaintiff was "qualified" in these circumstances will turn on whether she could perform the essential functions of the RSC position with or without reasonable accommodation. The EEOC regulations define "essential functions" as the "fundamental job duties of the employment position." 29 C.F.R. § 1630.2(n). Defendant names two alleged essential functions of the RSC position for which it believes Plaintiff's requested accommodations were "patently unreasonable:" 1) achievement of a sales quota; and 2) the ability to stand for long periods of time while serving customers. (Defendant's Brief in Support of Summary Judgment, Doc. 53 at 16).

With respect to the prohibition on sitting, Defendant argues that allowing Plaintiff to sit while working with a customer "would have removed an essential function of the RSC position – something employers are not required to do under the law."[17] (Defendant's Reply Brief, Doc. 56 at 11). While it is true, as Defendant points out (*see* Doc. 53 at 16), that "employers are not required to accommodate an employee by removing an essential function or restructuring a job so as to avoid it," *Skerski*, 257 F.3d at 286 n.4, it is far from

---

[17] The Court assumes for the sake of argument that sitting while working with a customer is fatally inconsistent with the alleged essential function of standing for long periods of time while serving customers. This determination is itself a factual question.

clear that standing for long periods of time was indeed an essential function of the RSC

position. Indeed, reasonable jurors could conclude that it was not. According to the

applicable regulations, "[a] job function may be considered essential for any of several

reasons, including but not limited to the following," 29 C.F.R. § 1630.2(n)(2):

(i) The function may be essential because the reason the position exists is to
perform that function;

(ii) The function may be essential because of the limited number of
employees available among whom the performance of that job function can
be distributed; and/or

(iii) The function may be highly specialized so that the incumbent in the
position is hired for his or her expertise or ability to perform the particular
function.

29 C.F.R. § 1630.2(n)(2)(i)-(iii). These enumerated reasons do not support a finding that

standing for long periods while serving customers is an essential function of the RSC

position. In particular, the Court notes that (i) the RSC position does not exist so that

employees may perform the function of standing for long periods; that (ii) nothing in the

record suggests standing for long periods affects the number of RSC employees required

by Defendant to conduct its business; and that (iii) standing for long periods of time is far

from a highly specialized function and Plaintiff was not hired for her expertise in it. *See*

*Turner*, 440 F.3d at 612-13 (conducting a similar essential function analysis for the act of

rotating among inspection machines in a chocolate factory).

Furthermore, "[e]vidence of whether a particular function is essential includes, but is

not limited to," 29 C.F.R. § 1630.2(n)(3):

14

(i)     The employer's judgment as to which functions are essential;

(ii)    Written job descriptions prepared before advertising or interviewing applicants for the job;

(iii)   The amount of time spent on the job performing the function;

(iv)    The consequences of not requiring the incumbent to perform the function;

(v)     The terms of a collective bargaining agreement;

(vi)    The work experience of past incumbents in the job; and/or

(vii)   The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(3)(i)-(vii). While factors (i), (ii), and (iii) appear to weigh in favor of Defendant on the issue of whether standing for long periods during the time that Plaintiff was employed by AT&T was an essential function, these factors are mitigated by Plaintiff's evidence of the type listed in 29 C.F.R. § 1630.2(n)(3)(vii): the current work experience of incumbents in similar jobs. AT&T RSCs are now permitted to sit, subject to certain specifications, while working with customers, (Doc. 56 at 4), and this evidence may lead a reasonable jury to conclude that standing for long periods of time is not an essential function of the RSC position. *See, e.g., E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 764 (6th Cir. 2015). ("[I]t makes sense to look at this kind of evidence [referred to in 29 C.F.R. § 1630.2(n)(3)(vii)]: It reflects the employer's judgment – which is not just what the employer says but also what the employer does."); *Melton v. Resorts Int'l Hotel, Inc.*, No. CIV.A. 11-

06449, 2014 WL 5341929, at *6 (D.N.J. Oct. 20, 2014) (considering Plaintiff's proffered evidence with respect to individuals currently working as door persons); *Acevedo v. City of Phil.*, 680 F. Supp. 2d 716, 735 (E.D. Pa. 2010) ("The fact that there are multiple crucial positions for uniformed officers within the Philadelphia Police Department who have no need to apprehend suspects, patrol, or use a weapon significantly bolsters Plaintiff's position that these are not essential job functions for all police officers."); *Toole v. Metal Servs. LLC*, 17 F. Supp. 3d 1161, 1173 (S.D. Ala. 2014) (considering evidence that employer hired various persons who were not required to drive or pass a medical examination after Plaintiff's job offer was withdrawn on those grounds).

The Court has doubts about whether standing for long periods of time while serving customers was an essential function of the RSC position, but, in any event, this is a question for the jury to decide. *Turner*, 440 F.3d at 613 ("While our analysis points in the direction of finding that the rotation policy was not an essential function of Turner's job, we have historically refused to make such a factual finding on our own, lest we run afoul of our own directive to the district courts that these issues are for the jury to decide."); *see also* 29 C.F.R. § Pt. 1630, App. ("Whether a particular function is essential is a factual determination that must be made on a case by case basis."). If it is a nonessential function, "[t]he ADA requires an employer to make whatever accommodations are reasonably possible in the circumstances to perform the functions essential to his position, including removing nonessential functions from the job." *Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 577 (7th

Cir. 2001) (citing, in part, *E.E.O.C. v. AIC Sec. Investigations, Ltd.*, 55 F.3d 1276, 1284 (7th Cir. 1995) (internal quotation omitted).

Neither is Defendant's second alleged essential function of the RSC position reason to grant Defendant's motion. For the purposes of this analysis, the Court will assume that meeting the sales quota is an essential function of the RSC position. *See* 29 C.F.R. § Pt. 1630, App. ("[T]he inquiry into essential functions is not intended to second guess an employer's business judgment with regard to production standards, whether qualitative or quantitative, nor to require employers to lower such standards."). But whether Plaintiff would have been able to meet her sales quotas *with or without reasonable accommodation* is a factual question at the heart of this case. *See Turner*, 440 F.3d at 614 ("As with the issue of "essential function," the issue of "reasonable accommodation" presents a fact question.").

Upon review of the record before it, the Court is unable to say that, as a matter of law, Plaintiff's requested accommodations, including the ability to sit while working with customers, are unreasonable. The EEOC regulations define "reasonable accommodation," in part, as "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position." 29 C.F.R. § 1630.2(o)(ii). "The duty to provide a reasonable accommodation is subject to certain limitations." *Turner*, 440 F.3d at 614. For instance, an employer is not

required to create a new position or provide an accommodation that would create a direct threat to the safety of Plaintiff or others. *Id.*

Plaintiff's requested accommodations, particularly the ability to sit while working with customers and the provision of extra time to document sales, seem simple and unobtrusive to this Court; Plaintiff has made a prima facie showing that her requested accommodations are reasonable. Given this, "the burden then shifts to [Defendant] to prove, as an affirmative defense, that the accommodations requested . . . are unreasonable, or would cause an undue hardship on the employer." *Turner*, 440 F.3d at 614. Defendant has made no such showing at this stage; any argument that the accommodations are unreasonable because they would gut an essential function of the RSC position fails for the reasons stated above. Additionally, any argument that the modified accommodations Defendant did offer, such as the option to sit away from the main work floor, were sufficient to allow Plaintiff to meet her sales quota is a question of fact as well. Thus, even if meeting a sales quota is an essential function of the RSC position, a reasonable jury could conclude that Plaintiff would have met the quota had she been granted some or all of her requested accommodations, such as the ability to sit while working with customers at her workstation. Whether Plaintiff was qualified to perform the essential functions of the RSC job with or without accommodations, and thus meets the second element of an ADA discrimination claim, is a question for the jury.

18

Lastly, the Court turns to the third element of a prima facie case for an ADA discrimination claim: whether Plaintiff has put forth sufficient evidence that she suffered an adverse employment action as a result of discrimination. Defendant argues that "Plaintiff cannot show that she suffered an adverse employment action" because "[t]he only relevant employment actions are the three (3) disciplines issued subsequent to Plaintiff's accommodation request." (Doc. 53 at 17). These disciplines in and of themselves, however, are not the adverse employment actions upon which Plaintiff rests her case: instead, she offers Defendant's alleged failure to accommodate her and her alleged disparate treatment in the form of "severe harassment," (Doc. 26 at ¶26), as the relevant adverse employment actions. *See Solomon v. Sch. Dist. of Phila.*, 882 F. Supp. 2d 766, 776 (E.D. Pa. 2012) ("[A] claim that an employer failed to accommodate an employee's disability is best viewed not as an independent claim under the ADA, but as a theory that may support a discrimination claim, with disparate treatment representing another possible theory.").

Though Defendant addresses elsewhere in its summary judgment briefing Plaintiff's allegation that it failed to reasonably accommodate her, Defendant has apparently neglected the fact that, under controlling law, "the failure to reasonably accommodate a disabled and qualified employee constitutes an adverse employment action for purposes of the ADA." *Turner*, 440 F.3d at 611, n.4; *see also Williams v. Philadelphia Hous. Auth. Police Dep't*, 380 F.3d 751, 771 (3d Cir. 2004) ("[A] failure to make a reasonable

accommodation for a disabled and qualified employee constitutes discrimination under the ADA."). For the reasons stated above, a jury could reasonably conclude that Defendant's failure to grant some or all of Plaintiff's requested modifications to her work environment constitutes a failure to reasonably accommodate her.

With respect to the second alleged adverse employment action, disparate treatment, Plaintiff has alleged she experienced specific incidents, as well as a general atmosphere, of mistreatment at AT&T. For instance, Plaintiff has testified that Kechula mocked her typing, which was affected by her Parkinson's disease, that other employees mistreated her and that Kechula failed to intervene, and that Kechula repeatedly called her away from the sale floor for illegitimate reasons. (See, e.g., Doc. 52, Ex. 1 at 38). The weight and credibility to assign to this testimony is a quintessential question of fact for the jury. Construing the record in the light most favorable to the Plaintiff, the Court finds that a reasonable jury could determine that Plaintiff suffered disparate treatment at the AT&T store in which she worked due her disability. Given the questions of facts that remain at this stage regarding Plaintiff's disability status, the essential functions of the RSC position and her ability to perform them without or without reasonable accommodation, and the alleged adverse employment actions she suffered, Plaintiff has made out a prima facie of discrimination under the ADA.

### b. McDonnell Douglas Step Two: Defendant's Rebuttal

Defendant makes several arguments as to why its actions towards Plaintiff were legitimate and nondiscriminatory and did not violate the ADA. First, it argues that Plaintiff,

by her own admission, was capable of performing the essential functions of the RSC position without any accommodations or with the modifications that Defendant did provide to her. (Doc. 53 at 15). Second, it argues that accommodating Plaintiff in the way she requested would have required altering the essential functions of the RSC position with respect to Plaintiff, something the ADA does not require it to do. (*Id.* at 16). Third, it argues that three disciplinary actions taken against Plaintiff after she requested accommodations do not add up to an adverse employment action sufficient for an ADA discrimination claim because the disciplines were based on undisputed sales numbers, they were relatively infrequent, and Plaintiff has not shown that they "had any tangible impact on the terms or conditions of her employment." (*Id.* at 17-19). The Court will address each claimed reason in turn.

Defendant cites several pieces of Plaintiff's deposition testimony in an attempt to show that Plaintiff did not need any accommodations beyond those which it claims to have provided her and possibly did not need them at all. (*See, e.g.,* Doc. 52 at 14-15; Doc. 56 at 5). The Court has reviewed Plaintiff's deposition in entirety and finds Defendant's characterizations of her testimony to be divorced of their context. Among the areas of the Plaintiff's deposition where Defendant has taken liberties with the record is the section questioning her on her remarks from the day she resigned. (*See* Doc. 52, Ex. 1 at 64-65). According to Defendant, Plaintiff told Kechula, "I love this job, and as you know, I am more than capable to do my job efficiently with the accommodations that were in place up until

21

now as reflected in my performance numbers." (SMF, Doc. 52 at ¶21); (Doc. 53 at 15).

First, this Court declines to hold Plaintiff, a layperson, to the same level of fluency and precision in use of legal terms as Defendant would. This is particularly so where Defendant's Counsel, in the same line of questioning and in response to Plaintiff's use of the phrase "forced resignation," told her "I understand the legal term constructive termination, constructive discharge. That's something we'll fight out." (Doc. 52, Ex. 1 at 64). Second, what Plaintiff meant when she told Kechula she was capable of doing her job efficiently with the accommodations is far from clear in her deposition testimony, which the Court reproduces here:

Q:   On P-40, you went into her office. This is today, October 9th. I'm on the third line: I love this job, and as you know, I am more than capable to do my job efficiently with the accommodations that were in place up until now as reflected in my performance numbers.

What were the accommodations that were in place up until then that allowed you to perform your job?

A:   The ones that were on the form back on Page 8, one of your – Exhibit 8, they were all the same.

Q:   The one from Reginald Hardy, 21?

A:   Yes.

Q:   So those were – those are accommodations that allowed you to perform your job?

A:   Most of them. Partially, sure. I was trying to hang onto my job.

Q:   You agree with me that you said, I am more than capable to do my job efficiently with the accommodations that were in place up until now.

A:    Up until now, is that what you're questioning?

Q:    Is that an accurate statement? These are your words, correct?

A:    That's my words, yes.

Q:    So AT&T was providing you accommodations that afforded you the opportunity to do your job?

A:    Partially, yes.

Q:    That's not what you say here.

A:    That's what I'm saying.

Q:    Now.

A:    Yes.

Q:    Okay.

This testimony is susceptible to a reading that Plaintiff was only "partially" able to do her job with any modifications that had been made at the time and that her ability to meet performance numbers was the result of a concerted effort "to hang onto" her job in the face of worsening Parkinson's symptoms and a lack of support in the workplace. Additionally, Plaintiff's job is one based, at least in part, on sales performance. *See supra* Part II. Thus, Plaintiff's statements could be read by a reasonable jury to mean that, while she could perform the physical tasks associated with her job, her performance without her requested accommodations would not be sufficient to *consistently* meet the relevant quotas; in Plaintiff's words, "I was always able to do my job, it's just I would be able to do my job better

23

with my accommodations." (Doc. 52, Ex. 1 at 23).[18]  The Court simply cannot sit as the

arbiter of Plaintiff's meaning at this stage in litigation; the weight and credibility of her

statements are issues for the factfinder.  Whether Plaintiff needed accommodations, which

ones, and to what extent are questions the parties' must "fight out" before a jury.

Furthermore, this Court declines to adopt Defendant's reading of the ADA to the

extent that it expects Plaintiff to be totally incapable of achieving the completion of some-job

related task before she may be entitled to a reasonable accommodation.  First, the Court

notes that, while whether Plaintiff is disabled within the meaning of the ADA is a question for

the jury, being 'actually disabled' in this sense requires only "a physical or mental

impairment that *substantially limits* one or more major life activities of such an individual."

42 U.S.C. § 12102(1)(A) (emphasis added).  The implementing regulations for this section

of the ADA explain that "[a]n impairment need not prevent, or significantly or severely

restrict, the individual from performing a major life activity in order to be considered

substantially limiting." 29 C.F.R. § 1630.2(j)(ii).  Thus, just because Plaintiff could,

hypothetically, stand for long periods of time with some degree of difficulty does not mean

that she would be per se disqualified from the ADA's protections.  And, if Plaintiff is indeed

disabled, the ADA's antidiscrimination provisions specify that failure to make reasonable

accommodations, absent undue hardship to the employer, constitutes discrimination.  42

---

[18] Plaintiff also made reference to the performance-based aspect of her job during her testimony: "I feel that I could have done my job much more favorably with all the different things that you have to meet your quotas and things. I don't think there would have been any doubt in my mind that I could have done my job much better [with the requested accommodations and without hostility from Kechula]." (Doc. 52, Ex. 1 at 80).

U.S.C. § 12112(b)(5)(A). Under the relevant federal regulations, reasonable accommodations include "[m]odifications or adjustments that enable a covered entity's employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities," 29 C.F.R. § 1630.2(o)(1)(iii), in addition to "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position," 29 C.F.R. § 1630.2(o)(1)(ii). The Court, thus, is not inclined to accept AT&T's arguments that, because Plaintiff testified that she can do her job, she is not entitled to reasonable accommodations, particularly in light of 29 C.F.R. § 1630.2(o)(1)(iii).

The Sixth Circuit has recently addressed a similar argument made by AT&T in a separate case: *Gleed v. AT&T Mobility Services, LLC*, --- Fed. App'x ---, 2015 WL 3505399 (6th Cir. 2015). Gleed, the plaintiff, suffered from chronic cellulitis and was employed as retail salesperson by AT&T. *Id.* at *1. Just as in the case at hand, Gleed's store had "standing terminals where employees showed customers AT&T's products." *Id.* Employees were required "to stand for long periods of time throughout the day." *Id.* But when Gleed stood for prolonged periods, circulatory problems caused by his cellulitis would lead to swelling, increased risk of infection, and increased eczema. *Id.* Gleed presented his supervisor with a note from a nurse-practitioner and requested "permission to use a chair on

the sales floor." *Id.* The supervisor refused Gleed's request. *Gleed*, 2015 WL 3505399, at *1. Gleed subsequently resigned and sued AT&T for discrimination under the ADA on a failure-to-accommodate theory based on AT&T's refusal to allow him to sit, as well as scheduling issues related to medical treatments. *Id.* He also made sex discrimination and constructive discharge claims. *Id.*

On appeal from the district court's grant of summary judgment to AT&T, the Sixth Circuit considered AT&T's argument that, in the court's words, "if Gleed was physically capable of doing his job – no matter the pain or risk to his health – then it had no obligation to provide him with any accommodation, reasonable or not." *Id.* at *3. The Sixth Circuit rejected this argument and reversed the district court with respect to Gleed's request to sit while on the sales floor, citing the "enjoy equal benefits and privileges of employment" definition of reasonable accommodation contained in 29 C.F.R. § 1630.2(o)(1)(iii). *Id.* This Court will follow the Sixth Circuit in holding that there is a triable dispute of fact as to whether or not AT&T failed to provide Plaintiff with reasonable accommodations, notwithstanding her own testimony that she was able to do her job.[19]

---

[19] Defendant argues that it is not required to provide an employee capable of performing the essential functions of the job "with additional assistance simply to help *improve* her performance." (Doc. 53 at 15). In support of this proposition, Defendant offers a citation to *Roloff v. SAP Am., Inc.*, 432 F. Supp. 2d 1111 (D. Or. 2006). This Court acknowledges that the district court in *Roloff*, in adopting the Findings and Recommendation of a magistrate judge, took a different view of the "equal benefits and privileges" definition of reasonable accommodation than does this Court and the Sixth Circuit panel in *Gleed*. The magistrate judge found that "[w]ith plaintiff's concession that he was able to perform those functions without reasonable accommodation, his reasonable accommodation claim must fail." *Id.* at 1120. The magistrate judge looked specifically to the EEOC's Technical Assistance Manual's examples of "equal benefits and privileges," which were "equal access to lunchrooms, employee lounges, rest rooms, meeting rooms, and other employer-provided or sponsored services such as health programs, transportation, and social events"

With respect to Defendant's second argument, the analysis of the essential functions of the RSC position and Plaintiff's ability to perform them with or without reasonable accommodation that is set forth above is equally applicable here. *See supra* Part IV(A)(1)(a). These are questions of facts, making whether this argument constitutes a legitimate and nondiscriminatory reason for the alleged adverse employment actions itself a matter for the jury. Finally, the Court finds Defendant's third set of arguments regarding the three disciplinary actions to present a defense based on facts that are manifestly in dispute, such that this defense does not entitle it to summary judgment. Rather, this defense must be proven at trial. By way of example, to the extent that Defendant argues that it did reasonably accommodate Plaintiff or that it Plaintiff did not experience disparate treatment based on her disability, and thus that there can be no other potential adverse employment action other than these three disciplines, these are questions of fact. *See supra* Part IV(A)(1)(a). Disputes of fact also remain as to whether Defendant's conduct contributed to or caused Plaintiff's underlying sales numbers. As to Defendant's argument that its alleged conduct resulted in low sales numbers only some of the time and that Plaintiff was "able to handle" Defendant's alleged conduct the majority of the time, it does not necessarily follow

---

and the possible requirement of the installation of a paper cup dispenser at a drinking fountain. *Id.* at 1121. While sitting while working is not of the same kind as these accommodations, this Court is unpersuaded by the Oregon district court's theory, which would have a consequence incongruous to the spirit of the ADA: under such a theory, an employer could be required to provide equal access to the benefit and privilege found in company social events while not being required to provide the benefit and privilege of working – "as other employees do – without great pain." *See Gleed*, 2015 WL 3505399, at *3.

that Defendant's conduct was not discriminatory. *See Gleed*, 2015 WL 3505399, at *3.

These are all questions for the jury to decide.

### c. McDonnell Douglas Step Three: Pretext

Despite, factual questions surrounding whether or not Defendant has met its burden

under the second step of the *McDonnell Douglas* burden-shifting framework, this Court will

proceed to the third step of the analysis out of an abundance of caution. "A plaintiff who has

made out a prima facie case may defeat a motion for summary judgment by either '(i)

discrediting the employer's proffered reasons, either circumstantially or directly, or (ii)

adducing evidence, whether circumstantial or direct, that discrimination was more likely than

not a motivating or determinative cause of the adverse employment action.'" *Wishkin v.*

*Potter*, 476 F.3d 180, 185 (3d Cir. 2007) (citing *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d

Cir. 1994). "[T]he non-moving plaintiff must demonstrate such weaknesses, implausibilities,

inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate

reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of

credence,' and hence infer 'that the employer did not act for [the asserted] non-

discriminatory reasons.'" *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994) (internal

citation omitted). "[A] plaintiff who has come forward with sufficient evidence to allow a

finder of fact to discredit the employer's proffered justification . . . need not present

additional evidence of discrimination beyond her prima facie case to survive summary

judgment." *Burton v. Teleflex Inc.*, 707 F.3d 417, 427 (3d Cir. 2013).

The Court finds that Plaintiff has come forward with sufficient evidence of pretext to survive summary judgment. For instance, Plaintiff combats Defendant's attempt to rebut her prima facie case by alleging a change in Defendant's treatment of her from prior to her accommodations request and related EEOC charge to after those occurrences. Plaintiff alleges that Defendant's perception of her went from one that was benign before her request for accommodations to one that included increased supervision, hostility, the threat of progressive discipline, and denials of assistance. (*See* Doc. 54 at 25). Where there is a dispute of fact, this Court must draw all reasonable inferences in Plaintiff's favor; this court is "keenly aware that credibility determinations are not the function of the judge; instead the non-movant's evidence must be credited at this stage." *J.F. Feeser, Inc. v. Serv-A-Portion, Inc.*, 909 F.2d 1524, 1531 (3d Cir. 1990). Thus, there is sufficient evidence for reasonable finder of fact to discredit Defendant's proffered justification for the alleged adverse employment actions in this case. "Summary judgment is to be used sparingly in employment discrimination cases." *Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 369 (3d Cir. 2008). Plaintiff has met her burden at the third stage in the *McDonnell Douglas* analysis and is entitled to put her case before the jury.

## 2. RETALIATION

"To establish a prima facie case of retaliation under the ADA, a plaintiff must show: (1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection

between the employee's protected activity and the employer's adverse action." *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997). After a plaintiff has established a prima facie case of retaliation, the *McDonnell Douglas* burden-shifting approach, *supra* Part IV(A)(1), is again applied. *See Krouse*, 126 F.3d at 500-01.

Defendant does not contest, for purposes of summary judgment, that Plaintiff can establish a *prima facie* case of retaliation. (Doc. 53 at 21). Because the adverse employment actions alleged for this claim are the same as those alleged with respect to Plaintiff's discrimination claim, the Court will not repeat its analysis of *McDonnell Douglas* Steps Two and Three here. There remain disputes of fact as to whether the alleged incidents of harassment were motivated by retaliatory intent. Defendant's Motion is denied with respect to Plaintiff's retaliation claim. *See supra* Part IV(A)(1)(b)-(c).

### 3. HARASSMENT

"A claim for harassment based on disability[20] . . . require[s] a showing that: (1) [Kessler] is a qualified individual with a disability under the ADA; (2) she was subject to

---

[20] The Third Circuit has "assume[d] . . . without confirming" that a cause of action for harassment/hostile work environment exists under the ADA. *Walton v. Mental Health Ass'n. of Se. Pennsylvania*, 168 F.3d 661, 666-67 (3d Cir. 1999). In the time since *Walton* was decided, the Third Circuit has presumed the existence of such a claim, analyzed under the *Walton* standard, without commentary. *See, e.g., Mercer v. SEPTA*, 608 F. App'x 60, 64 n.3 (3d Cir. 2015); *Sconfienza v. Verizon Pennsylvania Inc.*, 307 F. App'x 619, 623 (3d Cir. 2008). We will follow other district courts in the Third Circuit and analyze Kessler's harassment claim as a properly pleaded cause of action under the ADA. *See, e.g., Walsh v. Univ. of Pittsburgh*, No. CIV.A. 13-00189, 2015 WL 128104, at *14 (W.D. Pa. Jan. 8, 2015); *Mercer v. Se. Pennsylvania Transit Auth.*, 26 F. Supp. 3d 432, 443 (E.D. Pa. June 18, 2014) *aff'd sub nom. Mercer v. SEPTA*, 608 F. App'x 60 (3d Cir. 2015); *Sconfienza v. Verizon Pennsylvania, Inc.*, No. 3:05CV272, 2007 WL 1202976, at *11 (M.D. Pa. Apr. 23, 2007) *aff'd in relevant part*, 307 F. App'x 619 (3d Cir. 2008);

unwelcome harassment; (3) the harassment was based on her disability or a request for an accommodation; (4) the harassment was sufficiently severe or pervasive to alter the conditions of her employment and to create an abusive working environment; and (5) that [AT&T] knew or should have known of the harassment and failed to take prompt effective remedial action." *Walton v. Mental Health Ass'n. of Se. Pennsylvania*, 168 F.3d 661, 667 (3d Cir. 1999). Based on the foregoing analysis of Plaintiff's discrimination and retaliation claims, the first three elements of a prima facie case for harassment are in dispute such that they must be submitted for trial. Element four is also a jury question; the Court has found enough evidence in the record to raise questions as to the severity and pervasiveness of the alleged harassment. With respect to element five, there is evidence in the record that calls into question the conduct of Defendant's officials in responding to Plaintiff's request for accommodations and her complaints about her treatment; as such, whether Defendant's conduct through its representatives shows an effort to take effective remedial action or manifested hostility because of Plaintiff's request for accommodations and her disability is a matter for trial. Defendant's motion is denied with respect to Plaintiff's harassment claim.

## B. PLAINTIFF'S PENNSYLVANIA HUMAN RELATIONS ACT CLAIMS (COUNT II)

Count II of Plaintiff's Amended Complaint (Doc. 26) raises parallel claims under the Pennsylvania Human Relations Act ("PHRA"). "An 'analysis of an ADA claim applies equally to a PHRA claim.'" *Williams*, 380 F.3d at 761 n.6 (quoting *Taylor*, 184 F.3d at 306. As such, there are material factual disputes that entitle Plaintiff to try her PHRA claims

before a jury. Defendant's motion with respect to Count II is denied. *See, e.g. Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996) (noting that Pennsylvania courts generally interpret the PHRA in accord with federal civil rights statutes and holding that "the district court properly treated [plaintiff's] PHRA claims as coextensive with his ADA and ADEA claims.").

## B. DEFENDANT'S ALTERNATIVE MOTION FOR PARTIAL SUMMARY JUDGMENT

In the alternative, the Defendant asks that this Court grant it partial summary judgment "on the issue of economic damages (i.e. back pay and front pay) in light of [Plaintiff's] application for, and receipt of, SSDI benefits." (Doc. 53 at 25). The Court has reviewed Defendant's argument and the case law cited in support and has determined that Defendant's argument misrepresents the law applicable in the Third Circuit. As Plaintiff correctly points out in her Brief in Opposition, (*see* Doc. 54 at 27), SSDI determinations of disability do not consider the possibility that an applicant may have been able to work with reasonable accommodations. *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 803 (1999) ("[W]hen the SSA determines whether an individual is disabled for SSDI purposes, it does not take the possibility of 'reasonable accommodation' into account, nor need an applicant refer to the possibility of reasonable accommodation when she applies for SSDI."). Thus, the fact that Plaintiff has been deemed eligible for the receipt of SSDI benefits as of her last day of employment with AT&T is not *per se* inconsistent with her ADA claims or any potential award of economic damages should she prevail on those claims.

According to Defendant, such reference to *Cleveland* and its progeny "misses the point." (*See* Doc. 56 at 15). But it is Defendant who glibly ignores the role that the point of law clarified in *Cleveland* plays in the question of Plaintiff's economic damages. For instance, Defendant cites *Cavaliere v. Advertising Specialty Institute Inc.*, 853 F. Supp. 2d 472, 486-87 (E.D. Pa. 2012) and understands the district court there to have granted "summary judgment with respect to the plaintiff's claim for damages where – as in the instant case – she became eligible for SSDI benefits as of her last day of work." (Doc. 53 at 25). While Defendant's summary of *Cavaliere* is facially correct, it leaves out the crucial fact that the district court in that case determined that, *Cleveland* notwithstanding, Cavaliere's case presented a situation where her statements to the Social Security Administration *could not be reconciled* with her claims to the court that she could have performed the essential functions of her job, with or without reasonable accommodation. *Cavaliere*, 853 F. Supp. at 482-84. Cavaliere was "thus estopped from making out a prima facie case of discrimination under the ADA," *id.* at 484, and, applying "the same rationale," the district court held that the defendant was entitled to summary judgment on Plaintiff's damages claim for back and front pay. *Id.* at 487. In the case at bar, this Court has made no such finding with respect to Plaintiff's statements to the SSA; in fact, Defendant expressly denies that it is "arguing . . . that [Plaintiff's] claim for disability discrimination should be dismissed because she filed for, and is receiving, SSDI benefits." (Doc. 56 at 15). Defendant's motion for partial summary judgment on the issue of economic damages is, at best, wrong on the law, and, at worst, a

disingenuous attempt to gut Plaintiff's case of any monetary value it may have before her day in court.

If proven at trial that Defendant intentionally discriminated against Plaintiff, a jury could reasonably find that she would have kept her job with Defendant – and her pay – absent Defendant's discrimination and, thus, never would have been in a position to apply for or receive SSDI benefits. Though Plaintiff has received SSDI benefits, it is entirely possible that she would have earned a larger amount in that time had she remained employed with AT&T. To the extent that Defendant's concern is that awarding Plaintiff economic damages would allow her to, in a sense, "double dip," the Court reminds Defendant that, should this case proceed to trial, there will be a special verdict question as to the amount Plaintiff is owed if liability is imposed and that the Court retains the power to mold any jury award should such action be warranted. The Court will deny summary judgment on the issue of economic damages.

## V. CONCLUSION

Based on the foregoing, AT&T's motion for summary judgment will be denied in its entirety.

A separate Order follows.

Robert D. Mariani
United States District Judge

34